**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**COURT FILE NO.: _____**

| | |
|---|---|
| Vernon Nathaniel Rowe and Carla Walker-Rowe,<br><br>　　　　　Plaintiffs,<br>v.<br><br>TruStone Financial Federal Credit Union f/k/a Teacher Federal Credit Union, City of Prior Lake, Duane Lee Goldammer, individually and in his official capacity, Diversified Recovery and Investments, Inc., and Kim Pickner, individually,<br><br>　　　　　Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.　　This action arises from Defendants' numerous and illegal invasions of Plaintiffs' rights as citizens of the United States of America and as consumers.

**JURISDICTION AND VENUE**

2.　　Jurisdiction of this Court arises under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 15 U.S.C. § 1692k(d) for federal law claims and 28 U.S.C. § 1367 for supplemental state law claims.

3.　　Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391b(2).

## PARTIES

4.    Plaintiff Vernon N. Rowe (hereinafter "Plaintiff Rowe") is a natural person who
      resides in the City of Prior Lake, County of Scott, State of Minnesota, and is a
      "consumer" as defined by 15 U.S.C. § 1692a(3).  Plaintiff Rowe is the husband of
      Plaintiff Carla Walker-Rowe.

5.    Plaintiff Carla Walker-Rowe (hereinafter "Plaintiff Walker-Rowe") is a natural
      person who resides in the City of Prior Lake, County of Scott, State of Minnesota,
      and is a "consumer" as defined by 15 U.S.C. § 1692a(3).  Plaintiff Walker-Rowe is
      the wife of Plaintiff Rowe.

6.    Defendant TruStone Financial Federal Credit Union, formerly known as Teacher
      Federal Credit Union, (hereinafter "Defendant TruStone" or "TruStone") is a credit
      union organized under the laws of the United States of America.  Defendant
      TruStone is headquartered at 14601 27th Avenue South, Plymouth, Minnesota.
      Defendant TruStone is a "creditor" as defined by 15 U.S.C. § 1692a(4) and a
      "secured party" as defined by Minn. Stat. § 336.9-102(a)(72).

7.    Defendant Diversified Recovery and Investments, Inc. (hereinafter "Defendant
      Diversified" or "Diversified") is a corporation organized under the laws of the State
      of Minnesota.  Defendant Diversified is headquartered at 1535 200th Street East,
      Clearwater, Minnesota 55320.  Defendant Diversified is a "debt collector" as
      defined by 15 U.S.C. § 1692a(6).  Defendant Diversified is the alter ego of
      Defendant Kim Pickner.

8.     Defendant Kim Pickner (hereinafter "Defendant Pickner" or "Pickner") is a natural person who is an employee, agent, and owner of Defendant Diversified. Defendant Diversified is a "debt collector" as defined by 15 U.S.C. § 1692a(6). Defendant Pickner uses Defendant Diversified as an alter ego.

9.     Defendant City of Prior Lake (hereinafter "Defendant Prior Lake" or "Prior Lake") is a political subdivision of the State of Minnesota designated as a statutory city pursuant to Minn. Stat. § 412.  Defendant Prior Lake provides local law enforcement services through the Prior Lake Police Department (hereinafter "PLPD").  Defendant Prior Lake has its administrative offices at 4646 Dakota Street Southeast, Prior Lake, Minnesota 55372.  At all times relevant to this action, Defendant Prior Lake employed, trained, and supervised Defendant Duane Lee Goldammer to enforce the laws of the State of Minnesota.

10.    Defendant Duane Lee Goldammer (hereinafter "Defendant Goldammer" or "Goldammer") is a patrol officer employed, trained, and supervised by Defendant Prior Lake.  At all times relevant to this action Defendant Goldammer acted under color of state law.

## FACTUAL ALLEGATIONS

11.    Plaintiff Rowe is an educator and veteran of the Minneapolis Public Schools system.

12.    Plaintiff Rowe is currently Assistant Principal at North Community High School.

13.    Plaintiff Rowe and Plaintiff Walker-Rowe (collectively, "Plaintiffs") currently reside in a residential neighborhood in Prior Lake along with their two school-aged children.

14.    In January of 2005, Plaintiffs purchased a 1997 Acura RL (hereinafter the "Vehicle").

15.    Plaintiffs purchased the Vehicle with a loan from Defendant TruStone (hereinafter "the January 2005 Loan").

16.    Plaintiffs purchased the Vehicle for personal and family use.

17.    To secure payment of the January 2005 Loan, Plaintiffs gave Defendant TruStone a security interest in the Vehicle.

18.    In February of 2010, Plaintiffs paid the January 2005 Loan in full.

19.    In 2002, Plaintiffs purchased a 2001 Toyota Sequoia (hereinafter "the First Vehicle").

20.    Plaintiffs purchased the First Vehicle with a loan from Defendant TruStone (hereinafter "the 2002 Loan").

21.    Plaintiffs purchased the Second Vehicle for personal and family use.

22.    To secure payment of the 2002 Loan, Plaintiffs gave Defendant TruStone a security interest in the First Vehicle.

23.    In or around December of 2008, Plaintiffs' family finances suffered due to loss of income from Plaintiff Walker-Rowe.

24.    Until Plaintiffs could replace or supplement the family income, Plaintiffs determined that they would only be able to afford loan repayments for one vehicle.

25.   Plaintiffs voluntarily surrendered the First Vehicle to Defendant TruStone so that it could be sold and the proceeds applied to the balance on the 2002 Loan.

26.   In or around February of 2008, Defendant TruStone sold the First Vehicle.

27.   After Defendant TruStone applied the proceeds of the sale, Plaintiffs still owed about $9,000 on the 2002 Loan (the outstanding balance on the 2002 Loan hereinafter referred to as "the Debt").

28.   Plaintiffs were unable to pay the Debt in full immediately after the sale of the First Vehicle in or around February of 2008.

29.   Over the next three years, Plaintiffs made partial payments towards the Debt whenever possible.

30.   During those three years, Plaintiffs worked primarily with an employee of Defendant TruStone, one Maria Taylor (hereinafter "Taylor"), who repeatedly accepted Plaintiffs' partial payments on behalf of Defendant TruStone.

31.   In around April of 2011, Taylor told Plaintiff Rowe that Defendant TruStone would no longer work directly with Plaintiffs to arrange repayment of the Debt and that the Debt would instead be turned over to a collection agency.

32.   In fact, Defendant TruStone hired Defendant Diversified and Defendant Pickner to attempt to take possession of the Vehicle using self-help repossession.

33.   On information and belief, Defendant TruStone believes that the Vehicle is security for the Debt pursuant to a cross-collateralization clause in one or both of its loan agreements with Plaintiffs.

34.     Prior to July 16, 2011, Defendant TruStone never advised Plaintiffs that it believed the Vehicle was security for the Debt.

35.     Prior to July 16, 2011, Defendant TruStone never provided Plaintiffs with the notice required by *Cobb v. Midwest Recovery Bureau Co.*, 295 N.W.2d 232 (Minn. 1980) stating that it intended to strictly enforce the loan agreements.

36.     If a secured creditor fails to provide the notice required by *Cobb*, the secured creditor has no present right to the property claimed as collateral.

37.     On the evening of July 16, 2011, a Saturday, Plaintiffs and their children were visiting socially with Plaintiff Walker-Rowe's parents in Saint Paul.

38.     At around 8:41 p.m., Plaintiff Rowe received a message from the family's home alarm company stating that the burglary alarm at Plaintiffs' home had been triggered and the PLPD dispatched to the home.

39.     On information and belief, Plaintiffs' alarm was triggered by Defendant Pickner attempting to break-in to Plaintiff's locked garage to take the Vehicle.

40.     Plaintiffs arrived home at about 9:18 p.m. to find that the PLPD had already arrived and left, leaving behind a card stating that they checked the premises and found that everything was secure.

41.     Plaintiff Rowe also found a note from Defendant Pickner on his front door containing her name, phone number, and a request that Plaintiff Rowe give her a call.

42.     Plaintiff Rowe immediately called Defendant Pickner to find out what was going on.

43.   Defendant Pickner told Plaintiff Rowe that the Vehicle was security for the Debt, which was in default, and that she was coming to his home to take possession of the Vehicle on behalf of Defendant TruStone.

44.   Plaintiff Rowe told Pickner that he did not believe that the Vehicle was collateral for the Debt.

45.   Defendant Pickner told Plaintiff Rowe that if he did not voluntarily surrender his Vehicle she would bring the PLPD with her to his home to arrest him.

46.   Fearing a scene in front of his family and neighbors, Plaintiff Rowe told Pickner that he would turn over his Vehicle but that he also wanted to see the agreement whereby the Vehicle became collateral for the Debt.

47.   After Plaintiff Rowe ended his call to Defendant Pickner, Plaintiff Rowe called his brother-in-law, a former attorney.

48.   After speaking with his brother-in-law, Plaintiff Rowe decided not to voluntarily turn over the Vehicle until after he had an opportunity to speak with Defendant TruStone on Monday about his confusion regarding the loan agreements.

49.   At around 10:04 p.m., Plaintiff Rowe called Defendant Pickner back and advised her of his decision to refuse to voluntarily surrender the Vehicle, effectively revoking any perceived prior authorization to Defendant TruStone to pursue self-help repossession.

50.   Defendant Pickner told Plaintiff Rowe that if he did not voluntarily surrender his Vehicle he would be arrested, she would tell his neighbors that he does not pay his bills, she would tell his employer that he was arrested, and he would lose his job.

51.   Plaintiff Rowe told Pickner that he would still not voluntarily surrender his Vehicle until he had an opportunity to speak with Defendant TruStone.

52.   Defendant Pickner called the PLPD and spoke to Defendant Goldammer.

53.   Pickner told Goldammer that she was attempting to repossess Plaintiffs' Vehicle by self-help and that she was anticipating problems.

54.   Goldammer told Pickner to call the PLPD if there was a problem.

55.   Defendant Pickner then called Plaintiff Rowe back and threatened again to embarrass him by having him arrested in front of his family and neighbors.

56.   Defendant Pickner attempted to shame Plaintiff Rowe by calling him a coward.

57.   Plaintiffs feared for the safety of their children.

58.   Plaintiff Rowe called Plaintiff Walker-Rowe's parents, with whom the family had been visiting in Saint Paul prior to their burglar alarm going off, and asked them to pick up Plaintiffs' children.

59.   Plaintiff Walker-Rowe's sister and father arrived at the home and took the children to Plaintiff Walker-Rowe's sister's house in Savage, Minnesota.

60.   Plaintiff Walker-Rowe's mother stayed with Plaintiffs at their home.

61.   At about 10:17 p.m., Defendant Pickner arrived at Plaintiffs' home.

62.   Defendant Pickner exited her vehicle along with an adult male and three minor children.

63.   Defendant Pickner and her team, including the children, proceeded to shine flashlights into Plaintiffs' home, ring Plaintiffs' doorbell repeatedly, knock on the storm door leading to Plaintiffs' basement, knock on Plaintiffs' windows, and

shout into Plaintiffs' home, repeatedly calling Plaintiff Rowe a coward and challenging him to come outside and face them.

64. After about three minutes of terror, Defendant Pickner called Plaintiff Rowe again.

65. Plaintiff Rowe declined to answer, fearing that further contact would escalate the situation.

66. Plaintiff Rowe determined at this point that the best way to keep his family safe was to sit peacefully in the home.

67. Defendant Pickner then called Defendant Goldammer back and reported that Plaintiffs refused to voluntarily surrender the Vehicle.

68. Defendant Pickner reported to Defendant Goldammer that Plaintiffs had instructed her to leave their property.

69. Defendant Goldammer responded to Defendant Pickner's report by driving to Plaintiffs' home at about 10:35 p.m. in a marked PLPD car along with an unknown PLPD officer in a second marked PLPD car.

70. Defendant Goldammer rang Plaintiffs' doorbell repeatedly and demanded that Plaintiffs exit their home.

71. When Plaintiffs did not answer the door to their home, Defendant Goldammer walked to Plaintiff's front window and shined a flashlight inside the home.

72. Using the flashlight, Defendant Goldammer could see Plaintiff Walker-Rowe and Plaintiff Walker-Rowe's mother sitting peacefully in the home.

73. Defendant Goldammer shouted into the home and threatened that Plaintiffs "better not piss [him] off."

74.     Defendant Goldammer remained on Plaintiffs' property for at least another hour talking to Pickner.

75.      Defendant Goldammer attempted to call Plaintiff Rowe twice.

76.     Plaintiffs Walker-Rowe's father and sister returned to Plaintiffs' home after dropping Plaintiffs' children off at another sister's home in Savage, Minnesota.

77.     Defendant Goldammer, who had his PLPD car parked at the bottom of Plaintiffs' driveway on Plaintiffs' property, told Plaintiff Walker-Rowe's father that he could not park behind him at Plaintiffs' home and that he had to move his car to the entrance to Plaintiffs' cul de sac.

78.     Defendant Goldammer then asked Plaintiff Walker-Rowe's father what he was doing in Plaintiff's neighborhood.

79.     Plaintiff Walker-Rowe's father responded that he was visiting Plaintiffs.

80.     Defendant Goldammer told Plaintiff Walker-Rowe's father that "people don't visit other people late at night" and told him to leave and go home.

81.     Plaintiff Walker-Rowe's father and sister left Plaintiffs' neighborhood after Defendant Goldammer ordered them to do so.

82.     After ordering Plaintiffs' family members to leave, Goldammer and the other PLPD officer exited Plaintiff's driveway but stopped and parked at the entrance to Plaintiffs' cul de sac.

83.     At some point during the incident, Defendant Goldammer called and left Plaintiff Rowe a voice message and threatened to initiate criminal charges against him if he did not give the Vehicle to Defendant Pickner:

Hi, Mr. Rowe this is officer Goldammer with the Prior Lake Police Department. I'm outside your house. Its, uh, well now its Sunday morning at about one o'clock. Just to let you know, um, what's gonna be happening here is I'm gonna take the information that the repo people have here and I'm going to be forwarding a rep-, a criminal report, um, for uh, defrauding, uh, defrauding these people for not giving up the car when you had the opportunity to do so. Um, if you've got uh a very short time at this point to get this dealt with or I'm gonna have to refer this to the county attorney for criminal charges. Um, its your choice. You can contact me through Scott County dispatch at 952-444-1411 or you can leave a message on my voicemail at 952-***-9868.

84.   Eventually, officer Goldammer and the unknown PLPD officer left Plaintiffs' neighborhood.

85.   Thereafter, officer Goldammer prepared a "Case Report" documenting the incident at Plaintiffs' home.

86.   In the "Case Report" under "Case Description," officer Goldammer reported "theft."

87.   In the "Synopsis," officer Goldammer stated that he would contact the Scott County Attorney's Office about bringing criminal charges under Minn. Stat. § 609.62.

88.   Minn. Stat. § 609.62 has to do with concealing, removing, transferring, or refusing to disclose the location of secured property with intent to defraud the secured creditor.

89.   Minn. Stat. § 609.62 does not make "not giving up the car when you had the opportunity to do so" a crime.

90.   A debtor's due process right to refuse self-help repossession on their own property is a clearly established right.

91.  By affirmatively intervening on behalf of Defendants Diversified and Pickner and attempting to coerce Plaintiffs to give up their Constitutional and consumer rights, Defendant Goldammer misused his power.

92.  On information and belief, the PLPD has a policy or custom to intervene on behalf of secured creditors in self-repossessions.

93.  On information and belief, the PLPD has an illegal policy, practice, procedure, or custom to treat an individual's right to refuse self-help repossession on their own property as an incident of theft or some other criminal act.

94.  On information and belief, the PLPD fails to train and educate its officers that individuals have a right to refuse self-help repossession on their own property.

95.  As a direct result of Defendant Prior Lake's policy, custom, and failure to adequately train its officers with respect to the law governing self-help repossessions, PLPD officers deprived Plaintiffs of myriad Constitutional rights, including their right to free association, their right to be secure in their home from unreasonable searches and seizures, and their right to procedural and substantive due process protection of their enjoyment of their life, liberty, and property.

96.  After the PLPD officers left, Defendant Pickner and her team resumed terrorizing Plaintiff and his family.

97.  Defendant Pickner rang the doorbells of two of the Plaintiff's neighbors, including the Neuharth's that live next door to Plaintiffs.

98.  The Neuharths responded by turning on their interior and exterior lights.

99.  Defendant Pickner and her team shined their flashlights into Plaintiff's home.

100.  After learning that the PLPD officers had left, Plaintiff Walker-Rowe's father and sister returned to Plaintiff's home to pick up Plaintiff Walker-Rowe's mother, who was still inside.

101.  Defendant Pickner attempted to prevent Plaintiff Walker-Rowe's mother from leaving.

102.  Defendant Pickner took photographs of Plaintiffs' family members and their Vehicle.

103.  Defendant Pickner engaged in a shouting match with Plaintiff Walker-Rowe's mother, who asked Pickner to leave Plaintiffs' property.

104.  Defendant Pickner told Plaintiff Walker-Rowe's mother that Plaintiff would be going to jail.

105.  Defendant Pickner left Plaintiff Rowe a threatening voice message stating:

Hi Vernon its Kim.  I hope that you listened to the officer's voicemail that he left you.  I just want you to know that even if you don't answer the door tonight, for whatever reason, scared, whatever, doesn't matter to me, um, that if I have to just sit at your house two blocks away and wait for you to remove the car I will.  Its so much easier just to give it up, I mean, you're not winning anything here because I can tell you on Monday, when you make your arrangements, you're not gonna be able to make anything.  We're still gonna get your car, so, we've tried to help you out.  I wish you would cooperate and we could maybe resolve this but for whatever reason you don't want to do that.  If you decide you want to you know my number.

106.  About five minutes after her first message, Defendant Pickner left Plaintiff Rowe a second threatening message stating:

Just letting you know Vernon we're not leaving.  Cops said we could sit on this as long as we needed to.  And wait for this supposed person who knows everything.  But like the police said he's gonna go ahead and file the charges with the county attorney, um, whether you resolve with the bank or

not on Monday. You still get the charges pressed because you still committed the crime over the weekend. And, um, we can call them back at anytime we need. Um, we said go ahead and go, they had another call, and we'll sit here as long as we need to wait. Or we'll come when you least expect it. Um, and we'll get your vehicle. So, um, we could have done it the easy way but you chose to do it the hard way. I thought you were gonna be this big man and answer the door and face the problem. But you have to hide behind it. Good luck with that.

107.   About an hour after her second message, Defendant Pickner left Plaintiff Rowe a

third threatening message stating:

Hi Vernon, its Kim, yet again. We don't just go away, I mean, you know, and you know the police don't just go away, and you breaking the law just doesn't go away. And I mean this stuff just doesn't go away and I don't know why you would put your children through this. Um, you know, over and over, I mean, just face it, you can't pay your loan. So you have to suffer the consequences like everyone else who can't pay their bills. You're no different. So. We're gonna continue to knock on your door. We're gonna continue to call the cops there. We're gonna continue to talk to neighbors. And we're gonna continue to go places you go. I mean, school will be in session soon at Roosevelt. Um, I hate to visit you on your job but if I have to I will. Um, talk to the principal if we need to just let him know why we are there, what vehicle we're looking for. Chances are we'll have it long before then. Um, I'm definitely going to put a word in with the credit union as far as your actions tonight and how uncooperative you were. Um, and how chicken you were. Geez, I mean, you're a grown man, stand up and be responsible. Pathetic you put your wife and children through this. Um, you owe the money and you can't just screw over a bank and just pretend that you don't have to pay them. So if you want to be responsible and you want to not have charges pressed against you, like we told you, feel free to call me and we can still resolve it.

108.   At some point in the middle of the night, Defendant Pickner and her team left

Plaintiffs' home.

109.   Defendant Pickner call Plaintiff Rowe again at about 10:44 a.m. on Sunday July

17, 2011.

110.   Plaintiff Rowe did not answer.

111. Fearful that Defendant Pickner would continue to harass them and that Defendant Goldammer was going to come arrest them, Plaintiffs vacated their home on Sunday morning, July 17, 2011.

112. Plaintiffs stayed at Plaintiff Walker-Rowe's parents' house all day Sunday and overnight Sunday night.

113. That Sunday, Plaintiffs were too frightened of Defendant's Pickner's and Defendant Goldammer's threats to use the Vehicle or travel to any public place.

114. Plaintiffs missed their regular Sunday church service at Wayman African Methodist Episcopal church, where the family has attended service weekly for many years.

115. On Monday, July 18, 2011, Plaintiff Rowe called Defendant TruStone and spoke with Taylor about the terror over the weekend.

116. Plaintiff Rowe asked why he was never told that Defendant TruStone claimed the Vehicle as security for the Debt.

117. Taylor told Plaintiff Rowe that Defendant TruStone did not explain cross collateralization to him because if they told him that the Vehicle would serve as collateral for the Debt he would be less likely to have voluntarily surrendered the Second Vehicle.

118. Plaintiff Rowe begged Defendant TruStone to allow him to make payments towards the Debt in lieu of repossession.

119. At first, Taylor and her supervisor, Wayne, told Plaintiff Rowe that the self-help repossession instruction given to Defendants Diversified and Pickner would remain in place.

120. Plaintiff Rowe described the terror wreaked upon his home, family, and neighborhood by Defendants Diversified, Pickner, Goldammer, and Prior Lake.

121. Plaintiff Rowe begged Defendant TruStone again to allow him to make payments towards the Debt or to, at the least, obtain a court order before taking the Vehicle.

122. Defendant TruStone supervisor Wayne told Plaintiff Rowe that they would have to think it over.

123. Later that day, Taylor called Plaintiff Rowe back and advised that Defendant TruStone had decided to allow Plaintiffs to make payments on the Debt and would cancel the self-help repossession instruction give to Defendant Pickner.

124. From July 18, 2011 to the filing of this Complaint, Plaintiffs have made regular payments toward the Debt.

125. Plaintiffs were never arrested or charged with any crime.

126. Plaintiffs returned to their home shortly after reaching an agreement with Defendant TruStone, but the events of July 16 and 17, 2011 have caused permanent damage to their peace of mind and enjoyment of their property.

127. Plaintiff Walker-Rowe does not feel safe on the exterior of Plaintiffs' property, especially near the garage, and always quickly enters and exits the home.

128. Plaintiff Walker-Rowe does not feel safe near windows inside the family's home without shades and blinds drawn closed.

129.   Plaintiff Rowe does not feel safe driving the Vehicle.

130.   Plaintiff Rowe has experienced severe emotional distress related to his manhood,

his privacy, and his ability to be a good father.

## TRIAL BY JURY

131.    Plaintiff is entitled to and hereby demands a trial by jury.  U.S. Const. Amend. 7.

Fed. R. Civ. P. 38.

## CAUSES OF ACTION

## COUNT I.

## VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT (FDCPA) - 15 U.S.C. § 1692 *et seq.*

## AGAINST DEFENDANT DIVERSIFIED, DEFENDANT PICKNER, AND DEFENDANT TRUSTONE

132.    Plaintiffs incorporate by reference the above recited paragraphs as though fully

stated herein.

133.    The foregoing deliberate acts of Defendants Diversified and Pickner constitute

numerous and multiple violations of the FDCPA, including but not limited to 15

U.S.C. §§ 1692d, 1692e(4), 1692e(7), and 1692f(6).

134.   As a result of the above violations of the FDCPA, Plaintiff Rowe and Plaintiff

Walker-Rowe have suffered extreme mental anguish, fear, and frustration and are

entitled to an award of actual damages against Defendants Diversified and Pickner

pursuant to 15 U.S.C. § 1692k(a)(1) in an amount to be determined at trial.

135.   Defendants Diversified and Pickner are liable to Plaintiff Rowe and Plaintiff

Walker-Rowe for statutory damages pursuant to 15 U.S.C. § 1692k(a)(2).

136.   Defendants Diversified and Pickner are liable to Plaintiffs for their reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3).

## COUNT II.

### VIOLATION OF MINN. STAT. § 336.9-609 - BREACH OF PEACE

### AGAINST DEFENDANT DIVERSIFIED, DEFENDANT PICKNER, AND DEFENDANT TRUSTONE

137.   Plaintiffs incorporate by reference the above recited paragraphs as though fully stated herein.

138.   The self-help repossession attempts on the night of July 16, 2011 and early morning hours of July 17, 2011 by Defendants Diversified and Pickner constituted a breach of the peace, prohibited by Minn. Stat. § 336.9-609(b)(2).

139.   Pursuant to Minn. Stat. § 336.9-625(b), Defendants Diversified and Pickner are liable to Plaintiff Rowe and Plaintiff Walker Rowe for their actual damages caused by the breach of peace in amounts to be determined at trial.

140.   Pursuant to Minn. Stat. § 336.9-625(c), Plaintiff Rowe and Plaintiff Walker-Rowe are entitled to recover statutory damages from Defendants Diversified and Pickner.

141.   The duty to conduct self-help repossessions without breaching the peace is non-delegable under Minnesota law.

142.   Defendant TruStone is liable to Plaintiff Rowe and Plaintiff Walker-Rowe to the full extent of the liability of Defendants Diversified and Pickner for their breach of peace.

143.   Pursuant to Minn. Stat. § 336.9-625(a), Defendant TruStone is subject to an order restraining the enforcement of any alleged security interest in the Vehicle.

## COUNT III.

## INTRUSION UPON SECLUSION

## AGAINST DEFENDANT DIVERSIFIED, DEFENDANT PICKNER, AND DEFENDANT TRUSTONE

144.   Plaintiffs incorporate by reference the above recited paragraphs as though fully stated herein.

145.   Defendants Diversified and Pickner intentionally intruded upon Plaintiff Rowe's and Plaintiff Walker-Rowe's solitude, seclusion, and private concerns and affairs during the attempted self-help repossession of the Vehicle on the night of July 16, 2011 and early morning hours of July 17, 2011.

146.   Defendants' intrusion was substantial, highly offensive to Plaintiffs, and would be highly offensive and objectionable to the reasonable person in Plaintiffs' position.

147.   Plaintiffs had a legitimate expectation of privacy in their solitude, seclusion, and private concerns and affairs.

148.   As a result of Defendants' intrusion, Plaintiff Rowe and Plaintiff Walker-Rowe have suffered extreme fear, paranoia, emotional distress, and out-of-pocket loss and are entitled to awards of actual damages in amounts to be determined at trial.

## COUNT IV.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## AGAINST DEFENDANT PICKNER, DEFENDANT DIVERSIFIED, AND

## DEFENDANT TRUSTONE

149.   Plaintiff Rowe incorporates by reference the above recited paragraphs as though fully state herein.

150.   Defendants' attacks and threats against Plaintiff Rowe were extreme and outrageous.

151.   Defendants' attacks and threats against Plaintiff Rowe were intentional.

152.   Defendants' attacks and threats caused Plaintiff Rowe emotional distress that was severe.

153.   As a result of Defendants' attacks and threats, Plaintiff Rowe has suffered extreme fear, paranoia, emotional distress, and out-of-pocket loss and is entitled to an award of actual damages in an amount to be determined at trial.

## COUNT V.

## TRESPASS

## AGAINST DEFENDANT DIVERSIFIED, DEFENDANT PICKNER, AND

## DEFENDANT TRUSTONE

154.   Plaintiffs incorporate by reference the above recited paragraphs as though fully state herein.

155.   Plaintiffs own real property in Prior Lake.

156. Defendants unlawfully entered Plaintiffs real property to terrorize Plaintiffs, causing Plaintiffs to vacate their property with their children.

157. By unlawfully expelling Plaintiffs from their property by their trespass, Defendants have caused injury to Plaintiffs.

158. Plaintiffs are entitled to awards of damages in amounts to be determined at trial.

## COUNT VI.

## DEPRIVATION OF RIGHTS UNDER COLOR OF STATE LAW, 42 U.S.C. § 1983

## AGAINST DEFENDANT PRIOR LAKE AND DEFENDANT GOLDAMMER

159. Plaintiffs incorporate by reference the above recited paragraphs as though fully stated herein.

160. Defendant Goldammer's conduct, action, and inaction under color of state law deprived Plaintiffs of their Constitutional rights, including but not limited to their rights to procedural and substantive due process protections of their life, liberty, and property.

161. The deprivation of Plaintiffs' Constitutional rights at the hands of Defendant Goldammer was directly caused by Defendant Prior Lake's illegal policies and customs with respect to self-help repossessions.

162. The deprivation of Plaintiffs' Constitutional rights at the hands of Defendant Goldammer was directly caused by Defendant Prior Lake's failure to train Defendant Goldammer on debtor's rights in self-help repossessions.

163. The deprivation of Plaintiffs' Constitutional rights caused by Defendants Goldammer and Prior Lake was the result of Defendants' reckless and callous

indifference to Plaintiffs' federally protected rights to life, liberty, and property, necessitating an award of punitive damages against Defendants Goldammer and Prior Lake in amounts to be determined at trial.

164.   Defendants Goldammer and Prior Lake are liable to Plaintiffs for their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment as follows:

- awarding Plaintiffs actual and statutory damages against Defendants Diversified and Pickner for violations of the FDCPA pursuant to 15 U.S.C. § 1692k;
- awarding Plaintiffs reasonable attorney's fees and costs fees against Defendants Diversified and Pickner pursuant to 15 U.S.C. § 1692k;
- awarding Plaintiffs actual and statutory damages against Defendants Diversified, Pickner, and TruStone pursuant to Minn. Stat. §336.9-625;
- ordering Defendant TruStone to refrain from attempting to enforce any alleged security interest in Plaintiffs' Vehicle;
- awarding Plaintiffs damages caused by Defendants TruStone, Diversified and Pickner's illegal intrusion upon Plaintiffs' seclusion;
- awarding Plaintiff Rowe damages caused by Defendant TruStone, Diversified and Pickner's intentional infliction of emotional distress upon Plaintiff Rowe;
- awarding Plaintiffs compensatory and punitive damages caused by Defendants Goldammer and Prior Lake's illegal deprivation of their Constitutional rights;
- awarding Plaintiffs reasonable attorney's fees and costs against Defendants Goldammer and Prior Lake pursuant to 42 U.S.C. § 1988;
- and for such other and further relief as may be just and proper.

Dated this 11th day of June, 2012.

By: s/Thomas J. Lyons Jr._____

Thomas J. Lyons, Jr., Esq.

**CONSUMER JUSTICE CENTER, P.A.**

Attorney I.D. #:  0249646

367 Commerce Court

Vadnais Heights, MN 55127

Telephone:  (651) 770-9707

Facsimile:  (651) 704-0907

tommycjc@aol.com

***ATTORNEY FOR PLAINTIFFS***

## <u>VERIFICATION OF COMPLAINT AND CERTIFICATION BY PLAINTIFF</u>

STATE OF MINNESOTA      )
                                ) ss
COUNTY OF _____    )

        Vernon Nathaniel Rowe, having first been duly sworn and upon oath, deposes and says as follows:

1. I am a Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorney and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendants, cause unnecessary delay to any Defendants, or create a needless increase in the cost of litigation to any Defendants, named in the Complaint.
5. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.

                                                s/Vernon Nathaniel Rowe____
                                              Vernon Nathaniel Rowe

Subscribed and sworn to before me
this <u>11th</u> day of June, 2012.


<u>s/Lorie Cisar_____</u>
Notary Public

## VERIFICATION OF COMPLAINT AND CERTIFICATION BY PLAINTIFF

STATE OF MINNESOTA              )
                                                    ) ss
COUNTY OF _____     )

     Carla Walker-Rowe, having first been duly sworn and upon oath, deposes and says as follows:

6. I am a Plaintiff in this civil proceeding.
7. I have read the above-entitled civil Complaint prepared by my attorney and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.
8. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
9. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendants, cause unnecessary delay to any Defendants, or create a needless increase in the cost of litigation to any Defendants, named in the Complaint.
10. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.


                                                s/Carla Walker-Rowe_____
                                                Carla Walker-Rowe

Subscribed and sworn to before me
this 11th day of June, 2012.


s/Lorie Cisar_____
Notary Public